**IN THE COURT OF APPEALS OF IOWA**

No. 24-0475
Filed April 23, 2025

**LYLE NOLL,**
    Plaintiff-Appellee,

**vs.**

**BEVERLY FLEWELLING,**
    Defendant-Appellant,
_____

Appeal from the Iowa District Court for Ida County, Jeffrey A. Neary, Judge.

A party appeals from a partition ruling following an heirs-property dispute.

**VACATED AND REMANDED FOR FURTHER PROCEEDINGS.**

Blake C. Miller and Zachary T. Greder of Crary Huff P.C., Sioux City, for appellant.

Jason M. Cook of Cook Law Firm, Cherokee, for appellee.

Considered without oral argument by Greer, P.J., and Buller and Langholz, JJ.

**BULLER, Judge.**

Beverly Flewelling appeals from a district court ruling that partitioned heirs property such that she and four of her siblings received one aggregated parcel and her brother Lyle Noll received an individual parcel.  After the district court ruled, we decided and published a case addressing some of the legal issues underlying the heirs-property statute.  *See Muhr v. Willenborg*, 6 N.W.3d 752, 757–58 (Iowa Ct. App. 2024).  Given the issues raised by Beverly on appeal—about aggregated interests, the great-prejudice inquiry, how to characterize the ordered remedy, and the equities in light of these considerations—we find it most appropriate to vacate the district court's ruling and remand with directions to revisit the issues in light of our decision in *Muhr*.

## I.       Background Facts and Proceedings

The property at issue is 160 acres of land in Ida County, of which just under 140 acres are tillable.  The land is of variable productivity and varied topography. It's bisected by the Maple River, is intersected by another smaller waterway, has a ravine area in the center of the parcel, and has somewhat limited access to public roads.[1]

After the death of their mother, the land passed to the parties in this case, six siblings: Lyle Noll, Beverly Flewelling, Robert Noll, Richard Noll, Betty Hedberg, and Dale Noll.  Since then, the land has been cash-rented to a single tenant, and the parties have shared in the proceeds—though Beverly undertook most of the

---

[1] We note our appreciation for the parties' use of the map exhibits and their clear in-text identification of the source for the images included in the briefs.  In cases involving real estate, we tend to find maps and diagrams quite useful.

work managing the relationship with the tenant. The parties also received some income from a utilities easement.

In 2022, Lyle filed a petition for partition of real estate, naming his other siblings as defendants. In a bid to narrow the disputed issues, the parties stipulated to several major questions. They agreed:

- The land at issue was "heirs property" as defined in Iowa Code section 651.1(5) (2022);

- The court should appoint two co-appraisers and co-referees: Dennis Reyman and Mike Green;

- No party would request a "cotenant buyout" under section 651.29; and

- The fair-market value of the land in total was $1.96 million dollars.

Green described coming up with fair proposed partitions as a "challenging project." He concluded it "wasn't practical or fair" and really "not possible" to divide the land into six parcels, based on the topography and other factors. He ultimately offered two options—Plan A and Plan B—for partition, but he "wasn't extremely proud of either." Both plans established a sole parcel for Lyle along an edge of the land and left the other five siblings with an aggregated interest in the remaining land and owelty payments to equalize the parcel values. Green had concerns that leaving the other five siblings the remaining land was prejudicial because it "would be very challenging" to divide that parcel further.

Reyman proposed six equal parcels running east-west across the land. Broadly speaking, each of these parcels shared similar topographical features and flood risk. But they were unequal with regard to soil quality and tillable acres. Reyman's plan thus also required owelty payments.

Lyle testified to "fond memories" of his time growing up on the land and in more recent years with his children and grandchildren. He supported one of Green's proposals, to partition one-sixth of the land for him and leave the remainder in an aggregated parcel for his siblings. When asked why he should be treated differently than his siblings, Lyle answered: "Well . . . it's just kind of a difference between families. I mean, we have hunted it, we've fished. We've done all of this recreational stuff. And we've got other farmland close. It's just—it's very practical for me." Lyle also expressed frustration with his siblings for arguing and fighting about the land and described how he tried to sell the land to one or more of his siblings and felt they "lowballed" him.

Beverly similarly testified to fond memories of the land and sentimental attachment. She said that she also wanted to engage in recreational activities at the farm with her son, but she had avoided doing so because she "knew it would make Lyle angry" and was trying to keep peace in the family. Beverly confirmed that Lyle had previously tried to sell his share of the land to the siblings and others during the pandemic, which is why the prices offered were low—"Nobody was investing in anything. The prices were way down." And documents were admitted confirming Beverly's description of the conversations with Lyle and the growing discord over the topic in the family. Beverly also recounted multiple conversations in which Lyle told her it was not feasible to divide the land. And she remarked that it was "not convenient to have it with five other people," so she would have been open to dividing the land if it was fair to do so. By way of example, Beverly cited that she and her siblings had tried to make improvements to the land but, because

Lyle refused to sign an operating agreement with the other siblings, "[w]e had one person who could veto it and [Lyle] vetoed everything. Any suggestions."

Overall, Beverly's view was that the Green plan favored by Lyle "might be fair for Lyle. Not fair for [the other siblings]." In her words, what she wanted the court to do was come up with a solution that would be "fair to everybody. Not just Lyle. Not just Lyle gets everything he wants, and the rest of us can just deal with whatever he's left over. I think it should be fair to everyone." Beverly also thought that, if Lyle was going to get a parcel, then she wanted a parcel too. But she believed the realistic options were "either Lyle sells to [the other siblings], or we all sell." And she viewed the Reyman plan of dividing the land six ways as having "nothing good about it." In short, Beverly's view was that if the farm couldn't stay together, it needed to be sold.

Robert similarly testified to a "lot of memories" of growing up on the land and his emotional attachment to it. And he confirmed Beverly's account of Lyle attempting to sell his share of the land. Robert, like Beverly, thought the Reyman plan was unworkable and generally favored sale rather than partition. When pressed on whether he preferred selling the land or owning the remaining five-sixths, he said he "probably" would prefer the five-sixths.

Betty, like her siblings, also had memories of growing up on the farm, but felt less connected to it than the others because she hadn't spent time there recently. She said that, given the siblings' advancing age, she thought they should sell the whole farm rather than try to divide it—even though "it'd upset Mom."

Richard testified that he did not have much of a connection to the farm. He said that, given the stress of the family disagreements and "hassle" of going to court, he was ready to sell the land and be done with it.

Last, Dale testified to growing up on the farm with his grandparents and hunting there in later—though not recent—years. He said he opposed partitioning the land: "Knowing the farm as well as I do, that there is no fair way to separate it. And for it to be efficiently farmed it needs to be left as-is." But he also said he did not want to sell the land. He emphasized that he didn't think it was fair to partition off one section for Lyle and leave the rest of the siblings with the remainder. And, on cross-examination, he testified that he preferred selling the whole farm to the Green plan.

In its ruling, the court mused that it believed its options were limited:

Interestingly, the provisions of chapter 651 appear to contemplate only two conclusions to an action like the instant case, a partition in-kind or partition by sale. A denial of the relief requested (partition in-kind or by sale) is not expressly contemplated in chapter 651 subchapter III, which arguably would be consistent with the protective measures placed in the statute for heirs' property. Consequently, the Court must necessarily determine whether the partition here will be in-kind [or] by sale.

The court ultimately concluded that, for an in-kind partition, only Green's Plan B was workable given the topography and other features of the land. The court partitioned the land such that Lyle received a parcel to himself and the other five siblings jointly held the rest of the land (despite their testimony requesting three different dispositions of the land). Beverly appeals.[2]

---

[2] Lyle does not contest whether Beverly has standing to seek a remedy on behalf of all defendants or only herself, so we do not address that question.

**II.     Standard of Review**

"Actions to partition property are tried in equity and reviewed de novo.  We give weight to the district court's fact-finding, especially on credibility issues, but we are not bound by it.  As for statutory interpretation, our review is for correction of errors at law."  *Muhr*, 6 N.W.3d at 757 (citations omitted).

**III.     Discussion**

Iowa law has a statutory preference to partition "heirs property"—what is essentially the legal term for family farms—in kind rather than by sale.  *See id.* at 758.  To effectuate this preference, the General Assembly has provided that heirs property must be partitioned in kind unless doing so "will result in great prejudice to the cotenants as a group."  Iowa Code § 651.30.  Once a district court finds partition in kind would result in great prejudice, it may then partition the land wholly by sale or with a hybrid partition partially by sale and partially in-kind.  *Muhr*, 6 N.W.3d at 760.  The selection of partition by sale or a hybrid partition does not turn on the great-prejudice analysis; instead, the only consideration is whether the partition ordered is "equitable and practicable."  *Id.* at 763 (citation omitted).

We recognize the district court did not have the benefit of our decision in *Muhr* when it ordered what it described as "partition in kind" in this case.  At least as to the availability of hybrid partitions under the heirs-property statute, *Muhr* was a case of first impression and disavowed some arguably contrary dicta.  *See id.* at 761 (disavowing dicta in *Bruhn Farms Joint Venture v. Kuehl*, No. 21-1707, 2022 WL 5078275, at *5–6 (Iowa Ct. App. Oct. 5, 2022)).  We think it appropriate to remand this case to the district court to give that court an opportunity to revisit its

ruling in light of *Muhr*'s holding and clarification of the statute. This is particularly so given the issues raised by Beverly as the appellant.

Beverly first contends the district court did not have the authority "to aggregate [the siblings'] interests in the real estate rather than partitioning the real estate [wholly] by sale" without the siblings' express agreement to aggregate. And, in response to post-trial filings, the district court confirmed its understanding that "the defendants did not elect to aggregate their interests pursuant to Iowa Code section 651.30." With this backdrop, we have some question as to whether "partition in kind" is the right label for the district court's final action or whether the district court actually attempted to order a presumptive hybrid partition— partitioning Lyle's parcel in kind and anticipating partition by sale of the remainder divided among the defendant siblings. At least conceptually, siblings with similar interests might decide to aggregate their interests, and a hybrid division where multiple siblings are treated the same might work well. But here, the district court needed to be clear on its intended ultimate disposition for the land rather than leaving the defendant siblings with a functionally aggregated interest—despite them electing *not* to aggregate their interests—and unclear next steps if some or all desired to sell.

We recognize part of the confusion over aggregation may have flowed from Green's proposals, both of which aggregated the siblings' interests even though the siblings' interests (at least as disclosed at trial) differed. This exchange in the trial record, concerning Plan B, is illustrative:

> Q. And your plan essentially is to come up with one separate parcel, and then the rest of is—would be owned by the others?
> A. And that's one concern that I have, because the remaining 5/6th

> interest in the farm, I don't believe those can be divided up five ways. And so I don't want to create a prejudice to the remaining 5/6th by slicing that off. I mean, that was the concern I had. If I were one of the five remaining owners, and wanted to partition mine off, I don't know how one would do it.
>
> Q. So—and I don't want to put words in your mouth at all—so if the property was partitioned, either under Plan A or Plan B, as you've said, you would have a concern that the owners of the other 5/6th wouldn't be able to divide theirs? A. I think it would be very challenging. I don't know how one would do it.

In short, from Green's perspective, he had concerns if the interests were not aggregated and he thought partition wholly by sale was the next viable option if the court did not accept his plan. And from the court's perspective, the alternative offered by Reyman was entirely unworkable—leaving only Green's plan that required aggregation or partition wholly by sale. Given this record, it would be helpful to our review if we could understand how the district court took into account the position of each sibling in the overall scheme of the division and within its analysis of what is equitable and practicable. *See Muhr,* 6 N.W.3d at 763 (recognizing the respective wishes of the parties in that hybrid partition satisfied one party's sentimental attachment and the other parties' financial interest). We therefore direct that, as part of the remand to address the scope of available remedies, the district court also revisit the aggregation question while considering the legislative purpose of the heirs-property statute and our holding in *Muhr. See Bruhn Farms*, 2022 WL 5078275, at *7 (noting "the purpose of reinstating a partition-in-kind presumption was to prevent one member of a farm family from forcing a sale of the whole property when the others do not want to sell and can't afford the buyout").

Next, Beverly contends the district court misapplied the great-prejudice analysis when evaluating Green's proposed partitions. This is hard for us to evaluate given the district court's seeming misunderstanding that it could not order a hybrid partition and its choice to instead characterize its decision as partition in kind. In reading the ruling, it seems to us the court's great-prejudice inquiry may have gone a bit awry, as it concluded that Reyman's partition plan resulted in "great prejudice" but seemingly one of Green's plans did not. The statute does not direct the court to consider great prejudice with regard to individual partition plans but rather the concept of partition in kind as applied to the property. *See* Iowa Code § 651.30. Then the court fashions an appropriate partition based on the equities and what is practical for the land and the parties. *See Muhr*, 6 N.W.3d at 760. We vacate the ruling's great-prejudice analysis and direct the district court to evaluate the question consistent with our analysis in *Muhr*.

Last, Beverly contends the court should have ordered partition by sale. We cannot tell with certainty from the briefing whether she is urging the court should have partitioned the property wholly by sale or ordered a hybrid partition. Both are permissible remedies under the statute, and we have already vacated the ruling below in part because the district court did not recognize this. So we consider this error to be resolved for purposes of this appeal as well, given our remand for further proceedings.

## IV. Disposition

We vacate the district court's ruling and remand for further proceedings consistent with our decision in *Muhr*. We express no opinion on the ultimate disposition of the property after the district court conducts the analysis required by

*Muhr* and considers the possibility of a hybrid partition. And we leave to the discretion of the district court whether it may choose to hear new evidence or legal argument when conducting the remand.

**VACATED AND REMANDED FOR FURTHER PROCEEDINGS.**